UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

In re:

NRAD MEDICAL ASSOCIATES, P.C.,

                Debtor.

-------------------------------------------------------------------X

ALICE KIM, M.D., CORINNE TOBIN, M.D.,
DAVID KAPLAN, M.D., ELIZABETH LUSTRIN,
M.D., JAY BOSWORTH, M.D., JED POLLACK,
M.D., COLETTE ZITO, AS EXECUTOR OF THE
ESTATE OF JOSEPH ZITO M.D., AND JULIAN
SAFIR, M.D.,

                Plaintiffs,

       -against-

NRAD MEDICAL ASSOCIATES, P.C.

                Defendant.

-------------------------------------------------------------------X

Chapter 11

Case No. 15-72898 (LAS)

Adv. Pro. No. 20-08157 (LAS)

## MEMORANDUM DECISION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs Alice Kim, M.D., Corinne Tobin, M.D., David Kaplan, M.D., Elizabeth

Lustrin, M.D., Jay Bosworth, M.D., Jed Pollack, M.D., Colette Zito, as Executor of the Estate

of Joseph Zito M.D., and Julian Safir, M.D. (collectively, "Plaintiffs") commenced this

adversary proceeding against NRAD Medical Associates, P.C. ("NRAD" or "Debtor") alleging

that the proceeds received by NRAD from the demutualization of Medical Liability Mutual

Insurance Company ("MLMIC") constitute property of the estate and must be distributed to

Plaintiffs in respect of their allowed general unsecured claims in accordance with NRAD's

confirmed chapter 11 plan. Plaintiffs also allege that NRAD did not disclose the medical

malpractice insurance policies during the plan negotiation process and failed to disclose the

policies and demutualization plan when NRAD requested, post-confirmation, that Plaintiffs

discount their maximum distribution under the confirmed chapter 11 plan by 13.33%, i.e., a discount of $999,750, in connection with NRAD's sale of its ownership interest in Meridian Imaging Group, LLC to NYU Langone Medical Center. According to Plaintiffs, had they known that NRAD was eligible to receive proceeds from the MLMIC demutualization, they would not have agreed to discount the maximum distribution by accepting a payout from the proceeds received by NRAD from the NYU-Meridian transaction. Plaintiffs contend that the failure to disclose the medical malpractice insurance policies and the demutualization plan has enabled the current shareholders to reap the benefit of the $999,750 discount and renders NRAD accountable under theories of negligent misrepresentation, fraudulent inducement, fraudulent concealment, and breach of fiduciary duty. Correspondingly, Plaintiffs claim they should not be bound by the agreement to discount their maximum distribution under NRAD's confirmed chapter 11 plan.

For its part, NRAD has a different view as to the disposition of the proceeds from the demutualization of MLMIC. NRAD contends that the medical malpractice insurance policies in question were terminated prior to the commencement of its chapter 11 case. Thus, NRAD argues that it had no duty to disclose the policies during its chapter 11 case or thereafter, and that neither the policies themselves nor any of the proceeds received by NRAD from the MLMIC demutualization constitute property of the estate available for distribution to Plaintiffs in respect of their allowed unsecured claims. NRAD, therefore, maintains that Plaintiffs first claim for relief to enforce the chapter 11 plan and distribute the proceeds to Plaintiffs fails. NRAD further argues that Plaintiffs' remaining claims for relief for negligent representation, fraudulent inducement, fraudulent concealment, and breach of fiduciary duty likewise fail because (i) each of these claims is predicated on a finding that the policies and the proceeds received from the MLMIC demutualization are property of the estate, (ii) NRAD was not aware of the demutualization plan at the time it negotiated the discounted maximum

2

distribution due Plaintiffs under the confirmed chapter 11 plan, and (iii) Plaintiffs are bound by the terms of the agreement under which they consented to the NYU-Meridian transaction and reduced their maximum distribution under the confirmed chapter 11 plan by 13.33%.

Now pending before the Court are two motions for summary judgment. The first is a Motion for Summary Judgment ("NRAD SJ Mot.") (Dkt. No. 46) filed by NRAD seeking judgment in its favor on all five claims for relief asserted in the Complaint predicated on its central argument that proceeds received from the MLMIC demutualization are not property of the estate subject to distribution under its confirmed chapter 11 plan. The second is a Motion for Summary Judgment ("Pl. SJ Mot.") (Dkt. No. 47) filed by Plaintiffs seeking judgment in their favor on the first claim for relief in the Complaint determining that the proceeds derived from the MLMIC demutualization are property of the estate and must be distributed in accordance with NRAD's confirmed chapter 11 plan. Thus, the threshold question, and the heart of this dispute, is whether the demutualization proceeds constitute property of the estate.

The Court carefully reviewed the parties' submissions and heard oral argument on the motions. For the reasons set forth below, the Court grants Plaintiffs' motion and denies NRAD's motion as to the first claim for relief. The Court also denies NRAD's motion as to the second, third, fourth, and fifth claims for relief.

## <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the Standing Order of Reference of the United States District Court for the Eastern District of New York, dated August 28, 1986 (Weinstein, C.J.), as amended by Order dated December 5, 2012 (Amon, C.J.) entered in accordance with 28 U.S.C. § 157(a).

# BACKGROUND[1]

## I.    NRAD'S PREPETITION OPERATIONS

Plaintiffs are former shareholders of NRAD and creditors of NRAD's bankruptcy estate. JSF ¶ 1. NRAD was a professional corporation, organized under the laws of the State of New York, that operated a regional radiology imaging medical practice and a regional radiation therapy practice until June 1, 2015. *Id.* ¶¶ 2-3.

For several years prior to and as of the Petition Date, NRAD was owned by the current shareholders: Robert V. Blake, M.D., Paul D. Cayea, M.D., Paul S. Lang, M.D., Robin Ehrenpreis, M.D., Daniel Benjamin, M.D., Gene Berkovich, M.D. Eric Schnipper, M.D., and Paul Schorr, M.D (collectively, the "Current Shareholders"). *Id.* ¶ 4. In connection with NRAD's operations, NRAD employed various physicians, including Plaintiffs, Bilha Fish, M.D., Geraldine McGinty, M.D., Joshua Kern, M.D., Kim Podolnick, M.D., Leslie Feld, M.D., Lori Kelly, M.D., and Nina Vincoff, M.D. (collectively, and together with Plaintiffs, the "Former Shareholders"). *Id.* ¶ 5.

The Former Shareholders tendered their shares in 2013 and 2014. *Id.* ¶ 6. In return for the tender of their shares, the Former Shareholders received promissory notes (collectively, the "Redemption Notes") under various redemption agreements entered into with NRAD in 2013 and 2014 (collectively, the "Redemption Agreements"), as provided for in the operative Shareholder's Agreement. *Id.* ¶ 7. On November 5, 2014, one of the Former Shareholders, Nina S. Vincoff, M.D. ("Vincoff"), commenced an action in New York State Supreme Court, Nassau County, seeking payment in full on her Redemption Note. *Id.* ¶ 9; *Vincoff v. NRAD*, Index No. 605872/2014 (the "First Vincoff Action").

---

[1] The facts are drawn from the Joint Statement of Undisputed Facts ("JSF") (Dkt. No. 47) filed by the parties pursuant to Federal Rule of Bankruptcy Procedure 7056 and Local Bankruptcy Rule 7056-1. Citations to the JSF incorporate by reference the materials cited therein. Capitalized terms used but not defined in this Memorandum Decision and Order shall have the meanings assigned to such terms in the JSF.

On November 12, 2014, NRAD commenced an action in state court against the Former Shareholders, whereby NRAD sought to characterize the Redemption Notes as distributions to the Former Shareholders and to, accordingly, obtain a determination that the Redemption Notes payments were not required because NRAD was either insolvent or would be rendered insolvent thereby. JSF ¶ 10; *NRAD v. David Ebling, M.D., et al.*, Index No. 606028/2014 (the "NRAD Redemption Notes Action"). On February 9, 2015, Vincoff obtained a judgment against NRAD in the First Vincoff Action, in the amount of $318,994.09, which judgment was filed and entered on May 5, 2015 (the "Vincoff Judgment"). JSF ¶ 11. On April 10, 2015, NRAD and Vincoff entered into a security agreement (the "Vincoff Security Agreement"), whereby NRAD granted Vincoff a security interest in, and lien on, substantially all of NRAD's assets. *Id.* ¶ 12.

On or about June 1, 2015, NRAD transferred its assets to Blue Dot Holdings, LLC ("Blue Dot"). *Id.* ¶ 13. Thereafter, Blue Dot transferred those assets to Meridian Imaging Group, LLC ("Meridian"). *Id.* ¶ 14. Meridian was formed as a management services organization, 52.8775% of which was owned by Blue Dot; the remaining percentage was owned by an unrelated company. *Id.* ¶ 15.

On June 16, 2015, Vincoff commenced an action in state court against NRAD, Meridian, and Blue Dot, whereby Vincoff brought claims for, *inter alia*, replevin against Meridian and breach of the Vincoff Security Agreement and sought avoidance of NRAD's transfer of its assets to Blue Dot and Meridian. *Id.* ¶ 16; *Vincoff v. Meridian, Blue Dot, and NRAD*, Index No. 603887/2015 (the "Second Vincoff Action").

## II.    NRAD'S CHAPTER 11 CASE

On July 7, 2015 (the "Petition Date"), NRAD filed a petition for relief under chapter 11 of the Bankruptcy Code. JSF ¶ 17. NRAD commenced the chapter 11 case to restructure

its obligations, including those debts owed to the Former Shareholders. *Id.* ¶ 8. On April 7, 2017, NRAD filed its Second Amended Chapter 11 Plan (the "Bankruptcy Plan") and Disclosure Statement (the "Disclosure Statement"). *Id.* ¶ 26. On March 7, 2017, NRAD, the Official Committee of Unsecured Creditors, the Current Shareholders, and the Former Shareholders entered into the Plan Support Agreement, agreeing to the treatment of their claims in the Bankruptcy Proceeding. *Id.* ¶ 28. On June 6, 2017, the Court entered an order confirming the Bankruptcy Plan (the "Confirmation Order"). *Id.* ¶ 33. During NRAD's bankruptcy proceedings, NRAD did not reference MLMIC (as defined *infra* Section IV) or the MLMIC Policies (as defined *infra* Section IV). *Id.* ¶ 34. The Bankruptcy Plan also did not reference MLMIC or the MLMIC Policies. *Id.* ¶ 35.

On February 28, 2018, the Court entered the Final Decree and Order Closing NRAD's Bankruptcy Proceeding (the "Final Decree"). *Id.* ¶ 37. On March 15, 2018, the Bankruptcy Proceeding was closed. *Id.* ¶ 38.

## III.    THE NYU TRANSACTION

By the end of 2017, NRAD owned Blue Dot, a holding company with a 52.8875% ownership interest in Meridian. *Id.* ¶ 47. Affiliated Imaging Group, LLC ("Affiliated") owned the remaining 47.1125% membership interest. *Id.* The largest revenue source for Meridian was New York University School of Medicine ("NYU"): NYU, as Meridian's licensee, paid Meridian a fee each time NYU used Meridian's space, equipment, and non-professional services ("License Fees"). *Id.* ¶ 48.

In or about 2018, NYU sought to purchase Meridian. *Id.* ¶ 49. NYU threatened to terminate its license arrangement with Meridian and discontinue paying the License Fees, which was Meridian's chief source of revenue. *Id.* If NYU terminated its relationship and discontinued paying the License Fees, the payments due to NRAD's Current and Former

Shareholders under the Bankruptcy Plan could be jeopardized. *Id.* ¶ 50. As a result, NRAD determined that it had no choice but to enter into a transaction with NYU (the "NYU Transaction"). *Id.* ¶ 51. From about February 2018 until June 2018, NRAD was engaged in negotiations with, *inter alia*, NYU and some or all the Former Shareholders in connection with the NYU Transaction. *Id.* ¶ 52.

On April 9, 2018, NYU and Meridian entered into a letter of intent (the "LOI") setting forth the terms of the proposed purchase of Meridian by NYU. *Id.* ¶ 53. The NYU Transaction required the Former Shareholders and the Current Shareholders to accept a discount of the Maximum Distribution on their allowed claims under the Bankruptcy Plan. *Id.* ¶ 54. In connection with the NYU Transaction, NYU required, as a material term, that the Former Shareholders accept the sale and execute releases as against NYU. *Id.* ¶ 55. During the course of negotiations, the Former Shareholders initially consented to the NYU Transaction and to release NYU but did not agree that the receipt of proceeds of the NYU Transaction should satisfy the Former Shareholders' Claims. *Id.* ¶ 56. The Former Shareholders requested that the unpaid remainder of their claims remain outstanding as against NRAD and be payable, pursuant to the Bankruptcy Plan, from any interest in property that NRAD holds or acquires, over and above the proceeds received by NRAD as a result of the NYU Transaction, if any. *Id.* ¶ 57. NRAD declined to accept that term. *Id.* ¶ 58.

The Former Shareholders requested disclosure of NRAD's other assets. *Id.* ¶ 59. On May 31, 2018, counsel to NRAD sent an email stating that, "[o]ther than NRAD's interest in Blue Dot, NRAD's assets include accounts receivable, life insurance policies, an interest in a commercial co-op, and cash." *Id.* ¶ 60. The email further stated that the value of these assets were: (i) accounts receivable of uncertain collectability with a book value of $123,600; (ii) life insurance policies with a cash value of $2 million and death benefits of $3.6 million; (iii) a

commercial co-op with a book value of $225,000, determined from comparable sales; and (iv) approximately $167,000 in cash deposits, which were expected to be devoted to legal fees. *Id.* ¶ 61.

Representatives from NYU met with some or all of the Former Shareholders to negotiate the discount of the Maximum Distribution on their allowed claims under the Bankruptcy Plan. *Id.* ¶ 62. The Former Shareholders, except Dr. Kaplan and Dr. Kim, were represented by Meyer, Suozzi, English, and Klein, P.C., in the NYU Transaction. *Id.* ¶ 63. In or about June 2018, the Former Shareholders executed and delivered agreements consenting to the 13.33% discount of their allowed claims. *Id.* ¶ 64. The final agreement provided that the Former Shareholders would receive, from the proceeds of the NYU Transaction, a lump-sum payment of their Maximum Distribution under the Bankruptcy Plan, discounted by 13.33%, and that the Current Shareholders would receive an amount discounted by at least the same amount. *Id.* ¶ 65.

In or about July 2018, the Former Shareholders each executed and delivered a Declaration and Release agreeing to receive payment reflecting the 13.33% discount of their Maximum Distribution and releasing any and all claims against NYU. *Id.* ¶ 66. On or about July 25, 2018 (the "NYU Sale Closing Date"), the NYU Transaction closed, NRAD transferred its ownership interest in Meridian to NYU, and NRAD received its portion of the proceeds of the NYU Transaction. *Id.* ¶ 67. In connection with the NYU Transaction and related negotiations and/or disclosures, NRAD made no reference to MLMIC, the MLMIC Policies (as defined *infra* Section IV), or MLMIC's demutualization. *Id.* ¶ 68.

On or about July 27, 2018, NRAD disbursed to the Former Shareholders their portions of the proceeds of the NYU Transaction. *Id.* ¶ 69. Collectively, the Former Shareholders received $6,500,250 in proceeds from the NYU Transaction, on account of their collective

$11,197,658.61 in allowed claims as reduced to $7,500,000 under the Plan. *Id.* ¶ 70. Collectively, the Current Shareholders received $3,033,450 in proceeds from the NYU Transaction, on account of their collective $6,004,767 in allowed claims as reduced to $3,500,000 under the Plan. *Id.* ¶ 71. To the extent any of the claims of NRAD's other creditors remained unsatisfied at the time of the NYU Transaction, such creditors were paid in full from the NYU Transaction proceeds such that all claims against NRAD's estate have been satisfied, in full, except those of the Former Shareholders and Current Shareholders. *Id.* ¶ 72.

## IV.    MLMIC

Prior to the Petition Date, NRAD obtained medical malpractice liability insurance policies (the "MLMIC Policies") for various NRAD-employed physicians, including some or all of the Former Shareholders, through MLMIC to cover shareholders and employees for medical malpractice claims. *Id.* ¶ 73. At the time, MLMIC was a mutual insurance company, the ownership of which was vested, collectively, in the holders of MLMIC insurance policies. *Id.* ¶ 74.

In 2013, the NRAD-employed physicians ceased to be insured by MLMIC. *Id.* ¶ 75. On or about December 1, 2013, NRAD replaced the coverage it maintained through MLMIC with MedPro RRG Risk Retention Group serviced by Princeton Insurance Company. *Id.* ¶ 76. Each of the MLMIC Policies for the Former Shareholders listed NRAD as the "Policy Administrator" and indicated that the mailing address of the insureds was NRAD's address. *Id.* ¶ 77. Each of the MLMIC Policies relevant to this adversary proceeding indicated that NRAD, as the Policy Administrator, was "the agent of all Insureds herein for paying of Premium . . . and for receiving dividends and return Premiums when due." *Id.* ¶ 78. The MLMIC Policies also afforded NRAD with certain coverage, including indemnification, in the

event NRAD, as administrator for the insured physicians, was named as a defendant in an action to recover damages attributable to the insured physician covered by the MLMIC Policies. *Id.* ¶ 79.

During the relevant time period, NRAD paid the premiums on each of the MLMIC Policies for physicians employed by NRAD, and NRAD received all related returned unearned premiums from, and dividends issued by, MLMIC. *Id.* ¶ 80. As asserted by NRAD, "[NRAD] was exclusively responsible for managing and maintaining the subject policies and received all related dividends and return premiums from MLMIC, without objection from any of the [Former Shareholders] at any time. [The Former Shareholders knew, accepted, and acquiesced in [NRAD's] exercise of unfettered control and dominion over the subject MLMIC Policies." *Id.* ¶ 81.

On July 15, 2016, MLMIC's board of directors adopted its initial resolution to pursue a potential acquisition by National Indemnity Company ("NICO"), a subsidiary of Berkshire Hathaway Inc. *Id.* ¶ 82. As of the Petition Date, neither NRAD nor the Former Shareholders had knowledge of NICO's proposed acquisition of MLMIC, nor knowledge that any such acquisition could result in a payment to NRAD and/or the individual policyholders. *Id.* ¶ 83.

On May 31, 2018, and June 16, 2018, respectively, the MLMIC board adopted and revised the Plan of Demutualization (the "Demutualization Plan") for MLMIC's potential future conversion from a mutual insurance company into a stock insurance company (the "MLMIC Demutualization"). *Id.* ¶ 84. The Demutualization Plan was subject to the approval of the New York State Superintendent of the Department of Financial Services (the "DFS"). *Id.* ¶ 85. By virtue of the MLMIC Demutualization, after final approval, certain policyholders who were insured by MLMIC during a relative time period would be eligible to receive related proceeds therefrom. *Id.* ¶ 86.

The Current Shareholders testified that they did not become aware of the MLMIC Demutualization until Dr. Schnipper informed Dr. Berkovich and Dr. Benjamin, and Dr. Benjamin subsequently informed Dr. Lang and NRAD's Chief Financial Officer, Niki Kalaitzis ("Ms. Kalaitzis"), in August 2018. *Id.* ¶ 87. On or about August 20, 2018, Ms. Kalaitzis, contacted MLMIC regarding the MLMIC Demutualization. *Id.* ¶ 88. On August 20, 2018, Ms. Kalaitzis sent an email to the NRAD Board of Directors and counsel regarding the MLMIC Demutualization and the potential payment to eligible policyholders of the portion of the proceeds of the MLMIC Demutualization attributable to their policies (the "MLMIC Proceeds"). *Id.* ¶ 89. Drs. Kaplan, Kim, Bosworth, and Lustrin—Plaintiffs in the instant adversary proceeding—were some of the 52 former employees and shareholders that were eligible to receive the MLMIC Proceeds, since they were covered by MLMIC for the period of July 15, 2013 through July 15, 2016. *Id.* ¶ 90. The remaining Plaintiffs were no longer employees of NRAD during the period of July 15, 2013 through July 15, 2016, and thus, were not eligible policyholders for the MLMIC Proceeds. *Id.* ¶ 91.

NRAD thereafter emailed each of the individual eligible policyholders and requested that they consent to the payment of the MLMIC Proceeds to NRAD as policy administrator. *Id.* ¶ 92. Many of the individual eligible policyholders objected to payment of the MLMIC Proceeds to NRAD. *Id.* ¶ 93. Pursuant to the Demutualization Plan, NRAD had limited time to serve and file written objections upon MLMIC and fifty-two eligible former employees and shareholders. *Id.* ¶ 94. Absent timely objections by NRAD, MLMIC would release the MLMIC Proceeds to the individual eligible policyholders. *Id.* On or about August 22, 2018, NRAD, by and through Dr. Lang, sent emails to each of the eligible policyholders, which, of the Plaintiffs, included Drs. Kaplan, Kim, Bosworth, and Lustrin, informing them that NRAD intended to object to any distribution of the MLMIC Proceeds to the eligible policyholders

and to claim that NRAD is entitled to the receipt of such funds (the "Dr. Lang MLMIC Objection Email"). *Id.* ¶ 95. The Dr. Lang MLMIC Objection Email was the first communication by NRAD to the Former Shareholders with respect to the MLMIC sale. *Id.* ¶ 96.

As a result of the objections, MLMIC placed the MLMIC Proceeds in escrow pending a determination of which party is entitled to recover the proceeds. *Id.* ¶ 97. On August 23, 2018, the DFS held the required public hearing on the Demutualization Plan. *Id.* ¶ 98. On September 6, 2018, the DFS approved the Demutualization Plan. *Id.* ¶ 99. The Demutualization Plan did not determine whether the MLMIC Proceeds would be payable to a policyholder or a policy administrator. *Id.* On September 14, 2018, the MLMIC policyholders voted to accept the Demutualization Plan. *Id.* ¶ 100. On October 1, 2018, the MLMIC Demutualization closed. *Id.* ¶ 101. On January 14, 2019, the DFS issued an order requiring parties with "Unresolved Objections," such as NRAD, to advise MLMIC of the status of their claims. *Id.* ¶ 102. The DFS directed the parties to submit, within 120 days, a court order or joint notice advising that the parties were engaged in litigation or dispute resolution to prevent MLMIC from releasing the MLMIC Proceeds to the individual policyholders. *Id.*

## V. NRAD PURSUES ITS CLAIMS TO THE MLMIC PROCEEDS

In response to the individual policyholders' objections, NRAD commenced actions to determine which party was entitled to the MLMIC Proceeds, in order for MLMIC to release the funds from escrow to NRAD. *Id.* ¶ 103. NRAD pursued its claims against the individual eligible policyholders (including certain Plaintiffs) who objected to the MLMIC Proceeds being distributed to NRAD. *Id.* ¶ 104; *NRAD Medical Associates, P.C. v. Alice Y. Kim, et al.*, Index No. 617351/2018, Supreme Court of the State of New York, County of Nassau (the

"State Court Action"); *NRAD Medical Associates P.C., v. Adam P. Goldberg, et. al.*, AAA Case No. 01-18-0004-6997, AAA, Nassau County, New York (the "Arbitration").

On October 4, 2019, Arbitrator Erica Garay awarded the MLMIC Proceeds to NRAD. JSF ¶ 105. On October 28, 2019, Justice Timothy Driscoll of the Supreme Court of the State of New York, County of Nassau, awarded the MLMIC Proceeds to NRAD. *Id.* ¶ 106. MLMIC would not release the MLMIC Proceeds to NRAD until the decisions were "non-appealable." *Id.* ¶ 107. Neither the respondents in the Arbitration nor the defendants in the State Court Action sought to challenge the respective decisions. *Id.* ¶ 108. In February 2020, MLMIC accepted the two decisions as final and "nonappealable." *Id.* ¶ 109. In March 2020, NRAD received and distributed the MLMIC Proceeds to the Current Shareholders. *Id.* ¶ 110. As a result of the MLMIC sale, NRAD received MLMIC Proceeds in the amount of $ $3,225,923. *Id.* ¶ 111.

## VI.    THE ADVERSARY PROCEEDING

On May 8, 2020, Plaintiffs moved to reopen the Bankruptcy Proceeding. *Id.* ¶ 117; (Bankr. Dkt. No. 655).[2] On August 14, 2020, NRAD filed its opposition to Plaintiffs' motion to reopen. JSF ¶ 118; (Bankr. Dkt. No. 661). On September 17, 2020, the Court granted the motion to reopen to permit Plaintiffs to commence this adversary proceeding. JSF ¶ 119; (Bankr. Dkt. No. 665).

Plaintiffs filed the complaint commencing this adversary proceeding on September 24, 2020. JSF ¶ 120; (Dkt. No. 1). The Complaint asserts five claims for relief against NRAD: (1) enforcement of the Bankruptcy Plan; (2) negligent misrepresentation; (3) fraudulent inducement; (4) fraudulent concealment; and (5) breach of fiduciary duty. *See generally* Complaint (Dkt. No. 1). NRAD filed an answer to the Complaint (Dkt. No. 17). After the

---

[2] Docket references to the chapter 11 case of NRAD, Case No. 15-72898, are cited as "[Bankr. Dkt. No. __]."

initial pre-trial conference, the Court entered a scheduling order for discovery (Dkt. No. 20). The discovery scheduling order was thereafter amended on joint requests by the parties to extend the discovery completion date. (Dkt. Nos. 28, 32, 35, 38).

After the close of discovery, the Court granted the parties leave to file cross-motions for summary judgment and subsequently entered a Scheduling Order for Summary Judgment Motions (Dkt. No. 41) and an Amended Scheduling Order for Summary Judgment Motions (Dkt. No. 44). In accordance with the Amended Scheduling Order, the parties filed cross-motions for summary judgment along with corresponding materials including the Joint Statement of Undisputed Facts (Dkt. Nos. 46-55). The parties filed opposition to the respective cross-motions (Dkt. Nos. 50, 51), and replies in support thereof (Dkt. Nos. 53, 54).

## **DISCUSSION**

### I.    **SUMMARY JUDGMENT STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Bankruptcy Rule 7056, summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'") (quoting former Fed. R. Civ. P. 56(c)). A fact is considered material if it "might affect the outcome of the suit under the governing law," and a genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex*, 477 U.S. at 322-23. The evidence on each material element of its claim or defense must be sufficient to entitle the moving party to relief in its favor as a matter of law. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

If the movant meets its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56) (emphasis omitted). "[M]ere speculation or conjecture as to the true nature of facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Thus, to meet its burden, the nonmoving party must offer more than a "scintilla of evidence" that a genuine dispute of material fact exists, *Anderson*, 477 U.S. at 252, or that there is some "metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. It must present "significant probative evidence" that a genuine issue of fact exists. *Anderson*, 477 U.S. at 249 (internal citations and quotations marks omitted). In addition, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Porter v Quarantillo*, 722 F. 3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

On a motion for summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). The Court's job is "not to weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. N.Y.C.*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted). A court should grant the motion

if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).

When considering cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).

## II.    PROPERTY OF THE ESTATE

The filing of a chapter 11 petition creates an estate that includes "all legal or equitable interests of the debtor in property as of the commencement of the case," which becomes property of the estate. 11 U.S.C. § 541(a)[3]; *In re Ross*, 548 B.R. 632, 636 (Bankr. E.D.N.Y. 2016), *aff'd sub nom. Mendelsohn v. Ross*, 251 F. Supp. 3d 518 (E.D.N.Y. 2017). Property of the estate is defined broadly and includes "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative." *In re Reviss*, No. 19-44155, 2021 WL 1821873 (Bankr. E.D.N.Y. May 6, 2021) (quoting *Geltzer v. Soshkin* (*In re Brizinova*), 588 B.R. 311, 326 (Bankr. E.D.N.Y. 2018)). "Nevertheless, despite the recognized breadth of the term 'property of the estate,' it does have limitations." *Id.* "[A] significant role in determining the scope of the property of the estate is played by state law. Courts recognize that even though 'federal law determines whether a debtor's interest in property is property of the bankruptcy estate, rights and property interests are created and defined by state law.'" *Id.* (quoting *In re Gonzalez*, 559 B.R. at 330).

---

[3]All statutory references to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., will hereinafter be referred to as "§ (section number)."

"Because assets within the estate are those that exist 'as of the commencement of the case,' 11 U.S.C. § 541(a), property acquired by the debtor *after* the filing of a bankruptcy petition generally does not become part of the estate." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008). But "'[a]fter-acquired' property will vest in the estate if it is derived from property that was part of the estate as of the commencement of the bankruptcy." *Id.* (citing 11 U.S.C. § 541(a)(6)). "Post-petition property will become property of the estate only if it is 'sufficiently rooted in the pre-bankruptcy past.'" *Id.* (quoting *Segal v. Rochelle*, 382 U.S. 375, 380 (1966)). "[W]hen a corporation becomes the subject of a bankruptcy case, its insurance policies become property of the bankruptcy estate." *In re First Cent. Fin. Corp.*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999) (citations omitted).

## III.  ANALYSIS

### A.  First Claim for Relief

NRAD seeks summary judgment in its favor on the first claim for relief which seeks enforcement of the Bankruptcy Plan, arguing that the MLMIC Proceeds are not property of NRAD's bankruptcy estate. Plaintiffs maintain that summary judgment is properly granted in their favor on this claim for relief because the MLMIC Proceeds are property of NRAD's estate as either (i) the realization of a prepetition contingent, property interest and right of NRAD, (ii) postpetition proceeds of property of the estate, and/or (iii) property of the estate that has changed form. Plaintiffs argue that, since the MLMIC Proceeds are property of NRAD's bankruptcy estate, and the MLMIC Proceeds were not dealt with under the Bankruptcy Plan, they remain subject to the unsatisfied portions of the prepetition claims of NRAD's creditors.

The Court concludes that the MLMIC Proceeds are property of the estate for the reasons set forth below. The Court therefore grants Plaintiffs' motion, and denies NRAD's motion, as to the first claim for relief.

> **1. Courts have recognized that proceeds received by a debtor pursuant to a postpetition demutualization constitute property of the estate where the proceeds are derived from the debtor's prepetition interest in, or ownership of, the relevant insurance policies.**

The Court finds instructive two decisions where, in each case, the court determined that the proceeds received by a debtor postpetition from the demutualization of an insurance company constituted property of the bankruptcy estate. *See, e.g.*, *Omega Consulting, Inc. v. Osherow (In re Spector Red Ball, Inc.)*, No. ADV 11-5184-RBK, 2013 WL 1338036 (W.D. Tex. Mar. 29, 2013) (citing Order Denying Motion to Vacate, Dkt. No. 65 at 5-6, *In re TCC Industries, Inc.*, Case No. 00-13535); *In re Hanley*, 305 B.R. 84 (Bankr. M.D. Fla. 2003).

In *Omega*, after the bankruptcy proceedings of Spector Red Ball ("SRB") and its former parent, TCC Industries ("TCC") had closed, the TCC bankruptcy case was reopened when creditors asserted that certain newly discovered assets belonged to TCC's estate, to wit, approximately $430,000.00 in Prudential Financial common stock and dividends ("the Prudential Stock") arising from Prudential's demutualization. *Omega*, 2013 WL 1338036 at *2. The bankruptcy court entered a turnover order directing that the Prudential Stock be turned over to TCC's estate, and a receiver appointed for SRB filed a motion to vacate the turnover order, arguing that SRB—not TCC—was the owner of the Prudential policy and therefore entitled to the demutualization proceeds. *Id.* To determine whether the receiver had standing to file the motion to vacate, the bankruptcy court had to first decide whether

the Prudential Stock was an asset of either TCC or SRB's estate.[4] *Id.* at *3; Order Denying Motion to Vacate, Case No. 00-13535, Dkt. No. 65 at 6. The court concluded that the stock was the property of either estate and, therefore, the receiver lacked standing to file the motion. *Omega*, 2013 WL 1338036 at *3; Order Denying Motion to Vacate, Case No. 00-13535, Dkt. No. 65 at 6. In relevant part, the court observed that, because SRB owned the Prudential insurance policy prior to filing the petition, the stock was "derived from SRB's prepetition ownership of the insurance policy" and was therefore property of SRB's bankruptcy estate (if it was not transferred to TCC in the stock purchase agreement). *Omega*, 2013 WL 1338036 at *3; Order Denying Motion to Vacate, Case No. 00-13535, Dkt. No. 65 at 6.

The Western District of Texas relied on *Hanley*, where, after filing his bankruptcy petition and converting his case to a chapter 7 proceeding, the debtor received a notice regarding his account with Prudential announcing its "conversion from a mutual company to a stock company" and "issuing stock to eligible owners of the company." *Hanley*, 305 B.R. at 85. The debtor received 125 shares of Prudential and subsequently sold the stock. *Id.* at 85-86. The trustee argued that the debtor's stock was property of the estate. *Id.* at 86. The bankruptcy court agreed with the trustee, concluding that the debtor's interest in the underlying insurance policy was property of the estate under § 541(a)(1) and that the Prudential stock distributed to the debtor on account of the insurance policy was also property of the estate under § 541(a)(6) or § 541(a)(7), "*since the stock was generated from property of the estate.*" *Id.* at 86-87 (emphasis added). In other words, the stock was "derived directly from the Debtor's prepetition ownership of the life insurance policy" and "the issuance of the stock was

---

[4] In *Omega*, the chapter 7 trustee raised a question of whether SRB's interest in the Prudential life insurance policy was transferred to TCC as part of a stock purchase agreement. Order Denying Motion to Vacate, Case No. 00-13535, Dkt. No. 65 at 3. The Western District of Texas ultimately did not make any findings regarding the transfer, concluding that the stock was property of *either* TCC or SRB's estate. *Id.* at 4.

therefore 'rooted in the Debtor's prepetition past.'" *Id.* at 88. The court also noted that "[t]he distribution of the stock was not dependent on any postpetition conduct, services, or assets of the Debtor."[5] *Id.*

*TCC* and *Hanley* are instructive. Here, it is undisputed that NRAD maintained the MLMIC Policies prepetition. *See* Undisputed Facts ¶ 73 ("Prior to the Petition Date, NRAD obtained medical malpractice liability insurance policies . . . for various NRAD employed physicians, including some, or all, of the Former Shareholders, through [MLMIC] to cover shareholders and employees for medical malpractice claims."); *id.* ¶ 80 ("During the relevant time period, NRAD paid the premiums on each of the MLMIC policies for physicians employed by NRAD, and NRAD received all related returned unearned premiums from and dividends issued by MLMIC."); *see also* Order Denying Motion to Vacate, Case No. 00-13535, Dkt. No. 65 at 6 ("It is undisputed that SRB owned the Prudential insurance policy prior to filings its bankruptcy case."); *Hanley*, 305 B.R. at 88 (noting that "[i]n this case, the Debtor owned the life insurance policy prior to the date that he filed his bankruptcy case" and "the Prudential stock was issued to the Debtor solely on account of his ownership of the policy" as of a prepetition date). NRAD therefore had a prepetition interest in the policies, and the distribution of the demutualization proceeds was directly derived from—and rooted in— NRAD's prepetition interest. *See* NRAD Opp. at 6 (acknowledging that "NRAD's eligibility to claim the MLMIC Proceeds derived from its ownership of the MLMIC Policies").

### 2. NRAD's termination of the MLMIC Policies did not extinguish its contingent right to proceeds arising from any eventual demutualization.

NRAD makes much of the fact that it terminated the policies before the petition was filed. NRAD SJ Mot. at 5-6; NRAD Opp. at 6. But this does not eliminate the contingent

---

[5] Plaintiffs cite *Hanley* in their motion for summary judgment. Pl. SJ Mot. at 15-16. NRAD's attempts at distinguishing *Hanley* as "inapposite" (NRAD Opp. at 7) are unavailing for the reasons discussed herein.

interest NRAD had in the proceeds of any eventual demutualization. New York law affords eligible policyholders the right to receive, within three years of the adoption of a resolution by the board of the insurance company, the following consideration pursuant to a plan of demutualization:

> The plan shall also provide that each person who had a policy of insurance in effect at any time during the three year period immediately preceding the date of adoption of the resolution described in subsection (b) hereof shall be entitled to receive in exchange for such equitable share, without additional payment, consideration payable in voting common shares of the insurer or other consideration, or both. The equitable share of the policyholder in the mutual insurer shall be determined by the ratio which the net premiums (gross premiums less return premiums and dividend paid) such policyholder has properly and timely paid to the insurer on insurance policies in effect during the three years immediately preceding the adoption of the resolution by the board of directors under subsection (b) hereof bears to the total net premiums received by the mutual insurer from such eligible policyholders.

N.Y. Ins. Law § 7307(e)(3); *see also id.* § 7307(b) (requiring a resolution, "adopted by no less than a majority of the entire board of directors, specifying the reasons for and the purposes of the proposed conversion, and the manner in which the conversion is expected to benefit policyholders and the public").

Here, an initial resolution to pursue the potential acquisition by NICO was adopted by MLMIC's board on July 15, 2016. JSF ¶ 82. NRAD did not terminate the MLMIC Policies until on or around December 1, 2013. *Id.* ¶ 76. NRAD admits that it maintained the policy within the three-year statutory period:

> ***At all times relevant herein (July 15, 2013 through December 2013)***, NRAD: (i) paid the MLMIC policy premiums necessary to secure medical malpractice liability insurance covering the eligible policyholders' service as salaried employees working on NRAD's behalf; (ii) exclusively was responsible for managing and maintaining the subject policies; and (iii) received all related dividends and return premiums from MLMIC, consistently from the inception of eligible policyholders' employment with NRAD, and always without objection from the eligible policyholders' part (Amato Dec. Ex. J, ¶¶ 30 & 63).

*See* NRAD Opp. at 6 (emphasis added). Notably, the New York insurance statute in no way suggests that terminating the policy eliminates the right to receive a distribution pursuant

to section 7307(e)(3). To the contrary, the statute makes clear that an eligible policyholder who had a policy in effect "*at any time*" during the three-year period preceding adoption of the board resolution is entitled to receive consideration. N.Y. Ins. Law § 7307(e)(3) (emphasis added). NRAD was therefore entitled to receive the MLMIC Proceeds by virtue of its "prepetition ownership of the insurance polic[ies]." *See* Order Denying Motion to Vacate, Case No. 00-13535, Dkt. No. 65 at 6.

### 3. *Ross* does not require a different outcome here.

NRAD highlights a sequence of events beyond its control that had to occur before the Demutualization Plan was approved—i.e., the adoption and revision of the Demutualization Plan, a public hearing, DFS approval, and a vote of named policyholders. NRAD Opp. at 15. NRAD also notes that it had to pursue litigation and arbitration and prevail on its claims before it received the MLMIC Proceeds. *Id.* NRAD is incorrect to suggest, however, that this sequence of events confirms that it had no prepetition contingent interest in the MLMIC Proceeds.

NRAD relies primarily on *Ross*, where this Court considered a "somewhat novel question": whether postpetition proceeds received from the settlement of potential future products liability and personal injury claims—claims which the debtor may never have been able to bring on the underlying facts—constituted property of the debtor's estate. NRAD Opp. at 15-16; *Mendelsohn v. Ross*, 251 F. Supp. 3d 518, 523 (E.D.N.Y. 2017). In *Ross*, the trustee filed a motion to reopen debtor's chapter 7 case to administer settlement proceeds offered to the debtor in connection with potential claims regarding a medical device that was implanted in the debtor before the petition was filed. 251 F. Supp. 3d at 520. The debtor opposed the motion, arguing that the cause of action arose postpetition because the FDA issued an advisory opinion regarding defects with the implanted device—and the debtor became aware of such possible defects—years after the petition was filed. *Id.* The *Ross* court relied on the

Supreme Court's framework in *Segal*, which held that property acquired postpetition could become property of the estate "if it is 'sufficiently rooted in the pre-bankruptcy past.'" *Id.* at 523-27 (citing *Segal v. Rochelle*, 382 U.S. 375, 380 (1966)). The *Ross* court reasoned that "under the particular facts of this case," the settlement proceeds were not "sufficiently rooted in the pre-bankruptcy past" because "the most critical element" that created debtor's interest in the proceeds—the discovery of a defect in the device—occurred postpetition. *Id.* at 526.

NRAD's interest in the MLMIC Policies and MLMIC Proceeds is distinguishable from the interest at issue in *Ross*. Though the demutualization proceeds resulted from a postpetition event and were acquired postpetition, the "most critical element" that created NRAD's interest in the first instance was contributing to, and maintaining, the policies. *See* Order Denying Motion to Vacate, Case No. 00-13535, Dkt. No. 65 at 6; *Hanley*, 305 B.R. at 88; *see also* N.Y. Ins. Law § 7307(e)(3). In *Ross*, the court concluded that "it was the combination of an event that occurred in her prebankruptcy past (the implantation of the medical device) and certain post-bankruptcy events (the FDA issued an advisory opinion regarding possible defects with the medical device; appellee became aware of the possible defects) that ***created the interest*** that resulted in the settlement proceeds." *Ross*, 251 F.Supp.3d at 525-26 (emphasis added).  Here, as discussed *supra*, a cognizable contingent interest came into being *before* the petition was filed by virtue of maintaining the policy and the state statute in force at that time.

### 4.  NRAD's interest in the proceeds constituted more than a "mere expectancy."

NRAD attempts to characterize Plaintiffs' interest in the MLMIC Proceeds as a "mere expectancy." NRAD SJ Mot. at 5, 14; NRAD Reply at 2-4. The parties acknowledge that "mere expectancies" are not property of the estate. NRAD SJ Mot. at 5, 13 (collecting cases); Pl. SJ Mot. at 19 (same). As Plaintiffs correctly illustrate, the authority NRAD cites—involving

"mere expectancies" in the form of discretionary bonuses for employees and crop disaster relief pursuant to postpetition legislation—is not analogous to the interest at issue here and therefore does not militate a similar finding. *See In re Gonzalez*, 559 B.R. 326 (Bankr. E.D.N.Y. 2016); *In re Vote*, 261 B.R. 439 (BAP 8th Cir. 2001).

In *Gonzalez*, this Court concluded that a discretionary bonus paid to a debtor by an employer postpetition is not property of the estate. 559 B.R. at 328. The Court observed that, "if no 'right' exists pre-petition, contingent or otherwise, then there exists no 'right' to pass to the bankruptcy trustee such that the proceeds of that right would become property of the estate." *Id.* at 330. The Court reasoned that the debtor did not have a contingent right to receive a discretionary bonus because she "had no 'right' at all" to payment: she merely had an expectation of payment *if* her employer chose to exercise its discretion. *Id.* at 331. NRAD argues that it could neither demand that MLMIC demutualize nor demand payment pursuant to the policies and state statutes independently from MLMIC's decision to demutualize. NRAD Reply at 4. As such, NRAD maintains that it had no prepetition "contingent" right, and therefore, the MLMIC Proceeds cannot be the "realization" of any such right. *Id.*

As Plaintiffs note, in *Gonzalez*, "the debtor's employer maintained unfettered discretion to give, or not give, the debtor a bonus and, pursuant to New York law, at no time would the debtor ever have an actionable right to compel the payment of such discretionary bonus." Pl. Opp. at 4-5. Here, however, while it could not demand payment from MLMIC prepetition, NRAD "did have the right, in the event certain conditions were met (the demutualization of MLMIC) to receive its share of proceeds" by virtue of its prepetition interest in the policies and New York state law. *Id.* at 5. Notably, the language of the statute is mandatory, not discretionary. NY Ins. § 7307(e)(3) ("The plan ***shall*** also provide that each

person who had a policy of insurance in effect at any time during the three year period immediately preceding the date of adoption of the resolution described in subsection (b) hereof **shall be entitled to receive** in exchange for such equitable share, without additional payment, consideration payable in voting common shares of the insurer or other consideration, or both.") (emphasis added). While the choice to demutualize is ultimately left to the insurance company, in the event that this condition is satisfied—as it was here— eligible policyholders *must* receive consideration as set forth in the statute.

*Vote* is similarly inapposite. The BAP for the Eighth Circuit determined that postpetition crop disaster relief payments received by the debtor—pursuant to legislation that was enacted *after* the debtor's petition was filed—were not property of the estate. *Vote*, 261 B.R. at 441. NRAD cites *Vote* as holding that "the debtor did not have a contingent right to receive government assistance pursuant to Congressional action as *there was no statute providing for any potential entitlement to proceeds until after the debtor commenced the bankruptcy case.*" NRAD Reply at 4 (emphasis added). As Plaintiffs note, *Vote* is distinguishable. Here, New York Insurance Law Section 7307(e)(3), which establishes eligible policyholders' right to the distribution of proceeds in the event of a demutualization, was enacted prepetition.[6]

### B. Second, Third, Fourth, and Fifth Claims for Relief

NRAD seeks summary judgment on Plaintiffs' remaining claims for negligent misrepresentation, fraudulent inducement, fraudulent concealment, and breach of fiduciary

---

[6] The *Vote* court premised its decision on a more limited interpretation of *Segal*'s applicability—i.e., that the Supreme Court's holding in *Segal* is limited to tax refunds. 261 B.R. at 443-44 (observing that "[a] close examination of [the] legislative history . . . reveals that *Segal*'s holding may be viable only to the extent that it applies to tax refunds received or to be received postpetition" and noting *Segal*'s "questionable applicability . . . to the facts of this case"). Notably, the court observed that a different ruling might be required if *Segal* were read more broadly. *Id.* at 443 (noting that "a broad application of *Segal* might support a finding the CDP is property of the bankruptcy estate—The CDP payments are in some ways rooted in the prebankruptcy farming activities and are not 'entangled' in the Debtor's ability to make a fresh start").

duty. NRAD's motion is denied as to the second, third, fourth, and fifth claims for relief for the reasons set forth below.

### 1. Legal Standards

Under New York Law, the elements for a negligent misrepresentation claim are as follows: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

To establish a claim for fraudulent inducement under New York Law, the defendant must make a knowingly false representation of a material fact and there must be detrimental reliance thereon. *Osan Ltd v. Accenture LLP*, 454 F.Supp.2d 46, 52 (E.D.N.Y. 2006). In addition to proving the elements of a fraudulent inducement claim, "a party bears an additional burden when arguing that it was induced to enter into a contract by way of a misrepresentation." *Id.* The party must "either (1) demonstrate a legal duty separate from the duty to perform under the contract; (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (3) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.* (citing *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)).

Under New York law, the elements of a fraudulent concealment claim are as follows: "(1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6) damages." *Oden v. Boston Scientific Corporation*, 330 F. Supp. 3d 877, 898 (E.D.N.Y. 2018).

The elements of a cause of action for breach of fiduciary duty under New York law are as follows: "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *In re E.D.B. Constr. Corp.*, No. 11-76129-reg, 2013 WL 6183849, *10 (Bankr. E.D.N.Y. Nov. 26, 2013) (citing *Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*), 458 B.R. 87, 122 (Bankr. S.D.N.Y. 2011) (internal quotations omitted)).

## 2. *Analysis*

NRAD premises much of its argument that the remaining claims must fail on its position that NRAD had "no reason or obligation to disclose the MLMIC [P]olicies on the Petition Date," as it had no interest in the terminated policies or any right—contingent or otherwise—to potential demutualization proceeds during the pendency of the Bankruptcy Proceedings. NRAD SJ Mot. at 16-17; *see also id.* at 19 (arguing that "the MLMIC Policies and MLMIC Proceeds are not assets of the Bankruptcy Estate, and thus, NRAD had no obligation to disclose" them); *id.* at 20 (NRAD did not make a "false representation or omission regarding its assets and income" because "NRAD did not have a present interest in the MLMIC Policies to disclose, and NRAD's interest in the MLMIC Proceeds did not vest until February 2020"); *id.* at 22 (NRAD did not "engage in any misconduct" because it "did not have any basis to disclose the MLMIC Proceeds or any obligation to disclose the MLMIC Policies during the Bankruptcy Proceeding and NYU Transaction").

Considering the Court's ruling above, the Court rejects these arguments, as the Court has determined that the MLMIC Proceeds are property of the estate.

With respect to the second, third, and fourth claims for relief, NRAD maintains that these claims fail for the additional reason that NRAD had "no knowledge of the MLMIC Demutualization until after confirmation of the Bankruptcy Plan, entry of the Final Decree in the Bankruptcy Proceeding and closing the NYU Transaction." NRAD SJ Mot. at 16; *see*

*also id.* at 19 ("Neither NRAD, the Current Shareholders nor the Plaintiffs knew of the Demutualization Plan or the potential to the MLMIC Proceeds until after: (i) negotiation of the Plan Support Agreement; (ii) negotiation and confirmation of the Bankruptcy Plan; (iii) entry of the Final Decree; and (iv) closing the NYU Transaction.") (citing supporting evidence); *id.* at 20 ("The material facts do not support Plaintiffs' claim as the documents and testimony shows that at no time during the negotiation and confirmation of the Bankruptcy Plan, and the negotiation and closing of the NYU Transaction, that NRAD or the Plaintiffs had knowledge of the MLMIC Demutualization or that the MLMIC Demutualization would ultimately result in a distribution to eligible policyholders.") (citing supporting evidence).

Plaintiffs counterargue that summary judgment in favor of NRAD is inappropriate because there is "substantial evidence" that NRAD actually knew, or should have known, that MLMIC was in the process of demutualizing, and that NRAD may be eligible to receive the MLMIC Proceeds. Pl. Opp. at 13-15.

Plaintiffs cite an email dated September 16, 2020, and an affidavit dated June 6, 2019, as well as related deposition testimony, from Dr. Paul Lang in support of their contention that NRAD knew or should have known about the demutualization. *Id.* Plaintiffs also cite emails received by the Current Shareholders "dating back to as early as November 2016" that reference the proposed demutualization. *Id.* at 15 (citing Exhibit 17). Additionally, Plaintiffs point to periodic updates regarding the demutualization that were posted to the MLMIC website. *Id.* (citing Exhibit 18).

Considering the summary judgment record, the Court concludes that triable issues of fact exist, and NRAD has not demonstrated that no rational jury could find in favor of Plaintiffs. "No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that *no rational jury could find in the*

non-movant's favor." *D'Antonio v. Petro, Inc.*, No. 14-cv-2697, 2017 WL 1184163, at *12 (E.D.N.Y. Mar 29, 2017) (emphasis added) (citing *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996)). Resolving the parties' competing views as to what NRAD knew, or did not know, will require weighing testimony and making credibility determinations. At the summary judgment stage, the Court's job is "not to weigh the evidence or resolve issues of fact." *Lucente,* 310 F.3d at 254. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553-54 (citation omitted).

Therefore, NRAD's motion is denied as to the remaining claims for relief.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Plaintiffs' motion and **DENIES** NRAD's motion as to the first claim for relief. The Court also **DENIES** NRAD's motion as to the second, third, fourth, and fifth claims for relief. The parties shall appear for a pretrial conference on **February 29, 2024, at 10:00 a.m.,** in Courtroom 970, United States Bankruptcy Court, Eastern District of New York, 290 Federal Plaza, Central Islip, New York 11722.

So Ordered.



**Dated: January 26, 2024**
     **Central Islip, New York**

                                    **Louis A. Scarcella**
                           **United States Bankruptcy Judge**